Slip Op. 13 - 99

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AD HOC SHRIMP TRADE ACTION COMMITTEE,<br><br>       Plaintiff,<br><br>          v.<br><br>UNITED STATES,<br><br>       Defendant. | Before: Donald C. Pogue,<br>        Chief Judge<br><br>Consol. Court No. 12-00223[1] |

OPINION

[affirming in part and remanding in part the Department of Commerce's final results of antidumping duty administrative review]

Dated: August 2, 2013

    David A. Yocis, Nathaniel Maandig Rickard and Jordan C. Kahn, Picard Kentz & Rowe LLP, of Washington, DC, for Plaintiff Ad Hoc Shrimp Trade Action Committee.

    Robert G. Gosselink, Trade Pacific PLLC, of Washington, DC, for Plaintiffs Marine Gold Products Ltd., Pakfood Public Co. Ltd., Thai Royal Frozen Food Co. Ltd., Thai Union Frozen Products Public Co., Ltd., and Thai Union Seafood Co. Ltd.

    Joshua E. Kurland, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant.  Also on the brief were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director.  Of counsel on the brief was Michael T. Gagain, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

---

[1] This action is consolidated with Marine Gold Prods. Ltd. v. United States, Court No. 12-00220. Order, Nov. 20, 2012, ECF No. 22.

**Pogue, Chief Judge:**  This consolidated action seeks review of two determinations by the United States Department of Commerce ("Commerce") in the 2010-2011 administrative review of the antidumping duty order on certain frozen warmwater shrimp from Thailand.[2]  Specifically, Respondent Plaintiffs[3] challenge Commerce's decision not to calculate an individual dumping margin for Marine Gold.[4]  In addition, Plaintiff Ad Hoc Shrimp Trade Action Committee ("AHSTAC") – an association of domestic warmwater shrimp producers who participated in this review – challenges Commerce's decision not to reduce respondents' export prices by the amount of antidumping deposits paid for entries of subject merchandise.[5]

The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended,

---

[2] See Certain Frozen Warmwater Shrimp from Thailand, 77 Fed. Reg. 40,574 (Dep't Commerce July 10, 2012) (final results of antidumping duty administrative review) ("Final Results") and accompanying Issues & Decision Mem., A-549-822, ARP 10-11 (July 3, 2012) ("I & D Mem.").

[3] Respondent Plaintiffs are Marine Gold Products Limited ("Marine Gold"), Pakfood Public Company Limited, Thai Royal Frozen Food Company Limited, Thai Union Frozen Products Public Company Limited, and Thai Union Seafood Company Limited (collectively the "Respondents").

[4] See Mem. of Points & Auths. in Supp. of [Resp'ts'] [Mot.] for J. Upon the Agency R., ECF No. 28 ("Resp'ts' Br.").  Respondents' brief also presents arguments in support of additional challenges that Respondents are no longer pursuing. See Pls.' Reply Mem. in Supp. of Rule 56.2 Mot. for J. Upon the Agency R., ECF No. 49, at 1.  This opinion does not address those matters.

[5] See Mem. of L. in Supp. of Pl. [AHSTAC]'s USCIT Rule 56.2 Mot. for J. on the Agency R., ECF No. 29 ("AHSTAC's Br.").

19 U.S.C. § 1516a(a)(2)(B)(iii) (2006),[6] and 28 U.S.C. § 1581(c) (2006).

As explained below, Commerce's Final Results are remanded for reconsideration and/or further explanation regarding Commerce's rejection of Marine Gold's request for individual examination as a voluntary respondent. As also explained below, Commerce's denial of an export price adjustment for the payment of antidumping deposits is sustained.

**STANDARD OF REVIEW**

This court will uphold Commerce's antidumping determinations if they are in accordance with law and supported by substantial evidence. 19 U.S.C. § 1516a(b)(1)(B)(i). Where the antidumping statute does not directly address the question before the agency, the court will defer to Commerce's construction of its authority if it is reasonable. Timken Co. v. United States, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (relying on Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984)).

**DISCUSSION**

I. Marine Gold's Voluntary Respondent Request

Respondents challenge Commerce's denial of Marine Gold's request for individual examination as a voluntary respondent in

---

[6] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition.

this review. Resp'ts' Br. at 12-18.  Commerce argues that the Court should decline to adjudicate the merits of this challenge because of Respondents' alleged failure to exhaust their administrative remedies on this issue.[7]  In the alternative, Commerce contends that denying Marine Gold's request for individual examination comports with a reasonable interpretation and application of Commerce's statutory authority because granting the request would have been unduly burdensome for the agency. Def.'s Resp. at 16-18; see 19 U.S.C. § 1677m(a) (providing that Commerce may decline to calculate individual weighted average dumping margins for voluntary respondents not selected for mandatory examination if "individual examination of such exporters or producers would be unduly burdensome and inhibit the timely completion of the investigation").  Each argument will be addressed in turn.

First, the requirement for administrative exhaustion does not preclude consideration of Respondents' claim.  Certainly litigants challenging Commerce's determinations in antidumping proceedings are generally limited to the arguments submitted to Commerce in their administrative case briefs below. E.g., Ad Hoc

---

[7] Def.'s Mem. in Opp'n to Pls.' Rule 56.2 Mots. for J. Upon the Agency R., ECF No. 42 ("Def.'s Resp.") at 8-13; see Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1381 (Fed. Cir. 2013) ("The court 'shall, where appropriate, require the exhaustion of administrative remedies.' The doctrine of exhaustion provides 'that no one is entitled to judicial relief . . . until the prescribed administrative remedy has been exhausted.'") (quoting 28 U.S.C. § 2637(d) and Sandvik Steel Co. v. United States, 164 F.3d 596, 599 (Fed. Cir. 1998) (quoting McKart v. United States, 395 U.S. 185, 193 (1969)), respectively).

Shrimp Trade Action Comm. v. United States, __ CIT __, 675 F. Supp. 2d 1287, 1300 (2009).  But here Respondents argued in their case brief, as they do before the court, that Commerce's decision to deny Marine Gold's request for voluntary respondent status failed to comply with 19 U.S.C. § 1677m(a) because Commerce's finding regarding the undue burden of granting Marine Gold's request was unreasonable.[8]  Thus Commerce was put on notice of Respondents' challenge to the agency's finding of undue burden under 19 U.S.C. § 1677m(a).[9]  That Respondents have now structured their argument to take into account relevant legal interpretations that were contained in a decision issued subsequent to the filing of their case brief below[10] does not alter the essence of their legal

---

[8] Compare Case Br. of [Resp'ts], A-549-822, ARP 10-11 (May 11, 2012), Admin. R. Pub. Doc. 146, at 4-8, reproduced in Def.'s Resp. pub. app., ECF No. 43, at tab 3, with, Resp'ts' Br. at 12-18.

[9] Cf. Pakfood Pub. Co. v. United States, __ CIT __, 724 F. Supp. 2d 1327, 1352 (2010) (noting that the exhaustion doctrine requires parties to preserve arguments for judicial review by including them in their administrative case briefs because doing so puts the agency on notice of the relevance of such arguments and affords it an opportunity to fully consider and explain its response to specific challenges).

[10] See Resp'ts' Br. at 15-18 (arguing that Commerce's denial of Marine Gold's request for voluntary respondent status rendered 19 U.S.C. § 1677m(a) meaningless because "Commerce failed to show that the burden of reviewing Marine Gold as a voluntary respondent would have exceeded that presented in the typical antidumping review") (relying on Grobest & I-Mei Indus. (Viet.) Co. v. United States, __ CIT __, 853 F. Supp. 2d 1352, 1362-65 (2012) (holding that 19 U.S.C. § 1677m(a) is rendered meaningless where Commerce applies this provision to deny voluntary respondent status without showing "that the burden of reviewing a voluntary respondent would exceed

(footnote continued)

challenge.[11]  Accordingly, the requirement for administrative exhaustion does not preclude consideration of Respondents' claim.

As to the merits of Respondents' challenge, the antidumping statute provides that if it is "not practicable" for the agency to determine individual weighted average dumping margins for each known exporter and producer of the subject merchandise, then Commerce is authorized to limit its examination to "a reasonable number of exporters or producers." 19 U.S.C. § 1677f-1(c)(2).  Notwithstanding this provision, Commerce is nevertheless required to calculate an individual weighted average dumping margin "for any exporter or producer not initially selected for individual examination under [19 U.S.C. § 1677f-1(c)(2)]" – i.e., for any voluntary respondent – if that exporter/producer submits to Commerce the information requested from exporters or producers who were selected for examination, if "(1) such information is so submitted by the date specified . . . for exporters and producers that were initially selected for examination . . . and (2) the

---

that presented in the typical antidumping or countervailing duty review")); Def.'s Resp. at 8 (arguing that the court should apply the exhaustion doctrine because Respondents' case brief did not include the specific argument that Commerce's reasoning in denying Marine Gold's request for voluntary respondent status renders 19 U.S.C. § 1677m meaningless).

[11] Cf. JTEKT Corp. v. United States, 642 F.3d 1378, 1384 (Fed. Cir. 2011) (explaining that where a litigant did not have the benefit of a subsequently rendered legal decision, and thus could not have argued on that specific basis in briefing below, the litigant on appeal may rely on such subsequent decisions if the decisions support the arguments preserved for appeal).

number of exporters or producers who have submitted such information is not so large that individual examination of such exporters or producers would be unduly burdensome and inhibit the timely completion of the investigation." Id. at § 1677m(a).

The "unduly burdensome" standard was recognized in a prior decision holding that, when considering a request for individual examination pursuant to 19 U.S.C. § 1677m(a), Commerce "cannot draw its § 1677m(a) analysis so narrowly that it mirrors the analysis under § 1677f-1(c)(2)" because doing so would render § 1677m(a) meaningless. Grobest, __ CIT at __, 853 F. Supp. 2d at 1364. Grobest ordered Commerce to individually examine a voluntary respondent where the facts that Commerce put forward to support its conclusion that such examination would be unduly burdensome merely referred to "the same burdens that occur in every review." Id. at 1364-65; see id. at 1364 n.12 (listing factual circumstances proffered to support Commerce's conclusion that examination of an additional respondent would present an undue burden). Grobest held that to support a finding of *undue* burden, Commerce must "show that the burden of reviewing a voluntary respondent would exceed that presented in the typical antidumping of countervailing duty review." Id. at 1365.

Here, Commerce decided that individually examining Marine Gold would present an undue burden and inhibit the timely completion of the review based on factual circumstances very similar to those presented in Grobest. Compare I & D Mem. cmt. 2 at

16-17, with Grobest, __ CIT at __, 853 F. Supp. 2d at 1364 n.12.[12] As in Grobest, "the facts that Commerce put forward to support that conclusion do not distinguish this case from the paradigmatic review of an antidumping or countervailing duty order." Grobest, __ CIT at __, 853 F. Supp. 2d at 1364. Indeed, Commerce's own emphasis on prior experience with conducting administrative reviews – comparing the expected burden of examining Marine Gold to that of examining mandatory respondents in prior reviews[13] – suggests that

---

[12] Commerce emphasized the volume of data the agency was required to examine; the need to issue multiple respondent-specific supplemental questionnaires; prior experience showing that examination of one of the mandatory respondents is likely to necessitate multiple supplemental questionnaires and extensions of time; the fact that one of the mandatory respondents had not been previously reviewed and so would necessitate extra time to review; and the fact that the Import Administration generally, and the Operations Office handling this review in particular, was conducting multiple concurrent reviews. See I & D Mem. cmt. 2 at 16. This list of grievances is virtually identical to that rejected by the court in Grobest. See Grobest, __ CIT at __, 853 F. Supp. 2d at 1364 n.12. As the court explained in that case, none of these factual circumstances are extraordinary or suggest an undue burden on Commerce because they merely describe the administrative burden that Commerce must generally face in any antidumping duty administrative review. Accordingly, to permit Commerce to reject voluntary respondent requests on these bases alone would render § 1677m(a) meaningless because such factual circumstances are generally present in every case. See id. at 1364-65.

[13] See I & D Mem. cmt. 2 at 16-17 (emphasizing the burdens of previously examining Marine Gold as a mandatory respondent in a prior administrative review, including the need for "four supplemental questionnaires for which [Commerce] granted eight extension requests," but implicitly demonstrating the comparability of this burden to that of examining other respondents in prior proceedings, which Commerce describes as similarly involving multiple supplemental questionnaires and numerous deadline extensions).

what Commerce has here deemed to be undue burden is merely the usual burden of conducting a thorough review, which is insufficient to satisfy § 1677m(a)'s standard for rejecting a voluntary respondent request. Grobest, __ CIT at __, 853 F. Supp. 2d at 1364-65.

This matter is therefore remanded on the same grounds as those stated in Grobest. Grobest, __ CIT at __, 853 F. Supp. 2d at 1364-65.  On remand, Commerce must either "show that the burden of reviewing [Marine Gold] would exceed that presented in the typical antidumping or countervailing duty review," id. at 1365, or else review Marine Gold as a voluntary respondent.

II.  Denial of Antidumping Duty Export Price Adjustment

Next, AHSTAC argues that Commerce should have reduced the export prices calculated in this review by the amount of antidumping deposits paid on the subject entries. See AHSTAC's Br. at 8-24.[14]  Relying on 19 U.S.C. § 1677a(c)(2)(A),[15] AHSTAC argues

---

[14] Although AHSTAC repeatedly refers to the "final assessed antidumping duties" paid on entries of the subject merchandise, e.g., AHSTAC's Br. at 10, this characterization is misleading because the subject entries have yet to be liquidated and thus the final antidumping duties owed on them have yet to be actually assessed. Cf., e.g., Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d 1041, 1047 (Fed. Cir. 2012) (describing the United States' retroactive antidumping duty assessment system, in which "cash deposits [are] collected upon entry [as] estimates of the duties that the importer will ultimately have to pay as opposed to payments of the actual duties"); Hoogovens Staal BV v. United States, 22 CIT 139, 145, 4 F. Supp. 2d 1213, 1219 (1998) ("Under the [antidumping] statute, final duties are assessed upon liquidation of all subject merchandise entered during the period of
(footnote continued)

that the payment of antidumping deposits on these entries constitutes a duty, cost, charge, or expense "incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States," AHSTAC's Br. at 11 (quoting 19 U.S.C. § 1677a(c)(2)(A)), and must therefore be deducted from export price. Commerce defends its decision not to deduct the paid deposits from the export prices calculated in this review by relying on its long-standing and judicially-affirmed statutory interpretation that antidumping duty deposits "are not costs, expenses, or import duties within the meaning of [19 U.S.C. § 1677a(c)(2)(A)]."[16]  As explained below, because Commerce's decision not to reduce export prices by the amount of the antidumping deposits paid on the corresponding

---

review. The uncertainty of knowing the final amount of duties due at the time of entry is simply an inherent part of importing merchandise into the United States.") (internal quotation marks and citation omitted).

[15] ("The price used to establish export price . . . shall be . . . reduced by . . . the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States . . . .").

[16] I & D Mem. cmt. 3 at 22-23 (citing, *inter alia*, Certain Cold-Rolled Carbon Steel Flat Products from Korea, 63 Fed. Reg. 781, [787] (Dep't Commerce Jan. 7, 1998) (final results of antidumping duty administrative review); Hoogovens Staal, 22 CIT at 146, 4 F. Supp. 2d at 1220; AK Steel Corp. v. United States, 21 CIT 1265, 1280, 988 F. Supp. 594, 607 (1997)).

entries was based on a reasonable interpretation of an ambiguous statutory provision,[17] this decision is sustained.

AHSTAC is correct that in order to achieve a fair comparison between export price and normal value, the antidumping statute directs Commerce to make certain adjustments designed "to permit comparison of the two prices at a similar point in the chain of commerce."[18] But while it is true that the antidumping deposit paid on entries of subject merchandise has no corollary within the normal value of a foreign like product, it is not, strictly speaking, an additional cost included in the export price because it is a refundable security deposit to ensure that the importer

---

[17] Wheatland Tube Co. v. United States, 495 F.3d 1355, 1359-60 (Fed. Cir. 2007) ("[I]t is clear that Congress has not defined or explained the meaning or scope of 'United States import duties' as set forth in 19 U.S.C. § 1677a(c)(2)(A). . . . Thus, because Congress has not directly spoken to the precise question at issue, this court finds that the statute is ambiguous and proceeds to step two of Chevron. Under Chevron step two, . . . this court must give deference to [Commerce]'s interpretation of the statute . . . if the agency's interpretation is reasonable.") (internal quotation marks omitted) (relying on Chevron, 467 U.S. at 843-44); see also AK Steel, 21 CIT at 1280 & n.12, 988 F. Supp. at 608 & n.12 (holding that the antidumping statute is ambiguous regarding whether or not antidumping deposits constitute "import duties" or "additional costs, charges, and expenses" in the context of export price adjustment).

[18] Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995); see also Smith-Corona Grp. v. United States, 713 F.2d 1568, 1571-72 (Fed. Cir. 1983) (explaining that Commerce must adjust both normal value and export price "in an attempt to reconstruct the price at a specific, 'common' point in the chain of commerce, so that the value can be fairly compared on an equivalent basis"). For example, the export price is reduced by the cost of delivering the subject merchandise from the exporting country to the United States, 19 U.S.C. § 1677a(c)(2)(A), because this additional cost is not a part of normal value and so distorts the comparison.

does not purchase its merchandise below fair value. If upon review of the relevant pricing data Commerce determines that the subject entries were purchased at fair prices, then the importer will be refunded its deposit; but if the review reveals that the entries were obtained at prices below normal value, then the deposit may be forfeited and, to the extent that the deposit is exceeded by the actual antidumping duties owed, will require additional payment. 19 U.S.C. § 1673f; Sioux Honey, 672 F.3d at 1047.

As the antidumping deposit merely serves to provide an incentive to ensure fair export prices, rather than to burden importers with additional costs, Commerce's practice of not reducing export price by the amount of antidumping deposits paid on the subject merchandise has repeatedly been upheld because making such an adjustment would result in double-counting.[19] AHSTAC now argues that in fact there is no such risk of double-counting. AHSTAC's Br. at 13. As shown below, however, AHSTAC is incorrect.

To illustrate why an antidumping deposit adjustment to export price would result in double-counting, consider a simple hypothetical involving just one arms-length transaction per year.

---

[19] E.g., Hoogovens Staal, 22 CIT at 146, 4 F. Supp. 2d at 1220 (upholding "Commerce's long-standing policy and practice" of not treating antidumping deposits as import duties or costs); AK Steel, 21 CIT at 1280, 988 F. Supp. at 607 (upholding Commerce's explanation that reducing export prices to account for antidumping duties "would result in double-counting"); PQ Corp. v. United States, 11 CIT 53, 67, 652 F. Supp. 724, 737 (1987) ("If deposits of estimated antidumping duties entered into the calculation of present dumping margins, then those deposits would work to open up a margin where none otherwise exists.").

Assume a normal value ("NV") (after all relevant adjustments) of $110. Prior to the imposition of an antidumping duty order, Commerce investigates whether the merchandise is being sold in the United States at less than its normal value. Assume that during its investigation, Commerce calculates an export price ("EP") (after all relevant adjustments) of $100. Assuming an affirmative injury finding by the International Trade Commission, an antidumping duty order is issued and an estimated duty deposit rate is set for the producer/exporter in question at 10 percent ((NV – EP) / EP = (110 – 100) / 100 = 0.1 = 10 percent).[20] For each entry of subject merchandise from this producer/exporter made subsequent to the effective date of the antidumping duty order, the importer of record must now pay an antidumping deposit in the amount of 10 percent of the export price. Importantly, however, the *actual* antidumping duties owed on such entries are not calculated until one year following the issuance of the antidumping duty order, at which time (if a review is requested) the actual export prices of such entries are compared to contemporaneous normal values and an actual antidumping duty assessment rate is calculated. If the review reveals that export prices have now risen to match normal value, then the dumping margin (and so the antidumping duty

---

[20] To arrive at the weighted average dumping margins that will form the basis for antidumping duty assessment for each producer/exporter, Commerce divides its aggregate normal-to-export price comparisons by the aggregate export prices of the subject merchandise. See 19 U.S.C. § 1677(35)(B).

assessment rate) will be zero, and the antidumping deposit will be returned in full (with interest).

Continuing the hypothetical, assume that the next U.S. sale of subject merchandise that occurs after imposition of the antidumping duty order is made at an export price of $110 (after all relevant adjustments, but not including any adjustment for the antidumping deposit). Thus the importer pays $110 for the merchandise, as well as a 10 percent ($11) antidumping deposit. Assume for the sake of simplicity that this is the only transaction involving the subject merchandise during the first period of review. In reviewing this transaction to assess actual antidumping duties owed under the antidumping duty order, Commerce will compare the export price to the merchandise's normal value (which remains at $110). And here we come to the matter at issue.

AHSTAC's argument implies that Commerce should deduct from the export price the $11 antidumping deposit paid by the importer. Under this approach, the weighted average dumping margin (and so the actual antidumping duty assessment rate) for this transaction would be (NV – EP) / EP = (110 – (110 – 11)) / 110 = (110 – 99) / 110 = 11/110 = 0.1 = 10 percent. Because the duty assessment rate is equivalent to the antidumping deposit rate on the transaction, the importer would not receive any portion of its deposit back. Thus, under AHSTAC's proposed statutory interpretation, the importer pays a total of $121 (the $110 export price plus the $11 antidumping duty), even though normal value is

Case 1:12-cv-00223-DCP   Document 51-1   Filed 08/02/13   Page 15 of 20
Consol. Court No. 12-00223                                                    Page 15

only $110. In other words, this approach would force the importer to pay an antidumping duty even where the importer bought at normal value prices.

Under Commerce's long-standing and judicially-approved practice, on the other hand, the dumping (if any) is equalized by the assessment of antidumping duties, but the cessation of purchases at dumped prices is rewarded with the return of the deposit. Thus, Commerce does not reduce the (adjusted) export price by the amount of the importer's deposit (which the importer expects to be refunded if it buys at fair value): $(NV - EP) / EP = (110 - 110) / 110 = 0$, so the deposit is refunded to the importer, and the importer appropriately pays only the fair price ($110 export price plus the $11 antidumping deposit, minus the $11 deposit refund = $110, which is equivalent to normal value).

As this hypothetical makes clear, Commerce's explanation that reducing export price by the amount of the antidumping deposit would result in double-counting is logical. Reducing the export price by the amount of the antidumping deposit before comparing the export price to normal value would essentially force the importer to pay twice – once when paying an export price raised to normal value from the previously dumped price, and again when paying an

antidumping duty notwithstanding having already paid a non-dumped export price.[21]

AHSTAC also argues that the non-reimbursement regulation – pursuant to which Commerce reduces the export prices paid by importers whose antidumping duties are reimbursed by the producers or exporters of subject merchandise – provides support for its position. See AHSTAC's Br. at 21-22 (relying on 19 C.F.R.

---

[21] Contrary to AHSTAC's argument, this result is unchanged by the circumstances presented here, where the producer/exporter also served as the importer who paid the antidumping deposit. See AHSTAC's Br. at 10 (emphasizing that two respondents acted as their own importers). Just like the antidumping deposit paid by any other importer, the deposits at issue here will be refunded in the event that the administrative review reveals that normal values did not exceed export prices; deducting the deposits from the export prices prior to their comparison to normal value "would reduce the U.S. price – and increase the margin – artificially." Hoogovens Staal, 22 CIT at 146, 4 F. Supp. 2d at 1220. Moreover, the distortion remains even where export prices do not rise to fully match normal value. Assume that in the original unfair pricing investigation Commerce calculated a (properly adjusted) normal value of $150 and a (properly adjusted) export price of $100, thereby setting an antidumping deposit rate at 50 percent ((150-100)/100). Assume that only one entry of subject merchandise is made prior to final antidumping duty assessment at liquidation. In reviewing that entry, Commerce calculates an export price of $120 and a normal value of $150. Without any deduction for the 50 percent antidumping deposit, Commerce would calculate a final antidumping duty assessment rate for this entry at 25 percent ((150-120)/120), such that the importer would pay a total of $150 ($120 export price plus $30 antidumping duty (25 percent of export price)), thereby exactly matching the merchandise's normal value. But with a deduction to export price for the antidumping deposit, the assessment rate would be 75 percent ((150-(120-60))/120 = 90/120). In this scenario, the importer would pay a total of $210 ($120 in export price plus $90 antidumping duty (75 percent of export price)) even though normal value is only $150.

§ 351.402(f)(1)(i) (2012) (the "non-reimbursement regulation").[22] But this claim is similarly unpersuasive.

AHSTAC argues that where, as here, the producer/exporter also acts as the importer, the circumstances are indistinguishable from those leading to an export price reduction pursuant to the non-reimbursement regulation.[23] But the non-reimbursement regulation exists to ensure that the antidumping duty order's incentive for importers to buy at non-dumped prices is not negated by exporters who sell at dumped prices while removing the importer's exposure to antidumping liability.[24] The regulation does not entail, as AHSTAC suggests, treating antidumping duties as

---

[22] ("In calculating the export price (or the constructed export price), [Commerce] will deduct the amount of any antidumping duty . . . which the exporter or producer: (A) Paid directly on behalf of the importer; or (B) Reimbursed to the importer.").

[23] AHSTAC's Br. at 22 ("[O]n what grounds does Commerce distinguish the reimbursement situation from the undisputed facts of this case . . . ?  The record is devoid of any answer to this question . . . .").

[24] Hoogovens Staal, 22 CIT at 143, 4 F. Supp. 2d at 1218 ("The [non-]reimbursement regulation provides that the calculation of U.S. price include an adjustment for the amount of any antidumping duties reimbursed or paid by the exporter. . . .  Without the regulation, a foreign exporter or producer could assume the cost of antidumping duties owed and thereby nullify the effect of the duties in the U.S. market.") (citations omitted). Although Hoogovens Staal concerned 19 C.F.R. § 353.26 (1994) – the predecessor to the current non-reimbursement regulation, 19 C.F.R. § 351.402(f) – the substance of the regulation remained unchanged when the regulation was renumbered. See Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296 (Dep't Commerce May 19, 1997) (final rule) (announcing the final renumbering).

costs or charges to be deducted from export price to achieve a fair comparison.

To the contrary, Commerce's application of the non-reimbursement regulation supports the agency's reasoning that making an antidumping deposit deduction to export price in the absence of reimbursement would result in double-counting because Commerce applies the non-reimbursement regulation – which requires an export price deduction for reimbursed duty payments – by effectively double-counting the dumping margin.[25]  It follows that

---

[25] See, e.g., Nereida Trading Co. v. United States, __ CIT __, 683 F. Supp. 2d 1348, 1353 (2010) ("Because [an importer] had not filed a certificate of non-reimbursement . . ., Customs doubled the assessed duty margin . . . ."); Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316 (1994) at 886, reprinted in 1994 U.S.C.C.A.N. 4040, 4211 (noting that Commerce's practice in applying the non-reimbursement regulation "is to instruct Customs to double the duties if the importer fails to furnish a certificate of non-reimbursement to Customs prior to liquidation of entries").  To see why this is so, assume that, during the investigation upon which an antidumping duty order is based, Commerce calculated a (properly adjusted) normal value of $110 and a (properly adjusted) export price of $100, thereby setting an antidumping deposit rate of 10 percent ((110-100)/100). After the antidumping duty order goes into effect, the importer must now pay a 10 percent deposit on entries of subject merchandise, which will be refunded only if the importer buys at non-dumped prices.  But now assume that the exporter promises to reimburse the importer for the 10 percent deposit, permitting the importer to continue to buy at dumped prices without threat of losing its deposit.  Assume that only one entry of subject merchandise is made prior to final antidumping duty assessment at liquidation.  In reviewing that entry, Commerce calculates an export price of $100 and a normal value of $110.  In the absence of the non-reimbursement regulation, the weighted-average dumping margin (and so the actual antidumping duty assessment rate) for that entry would be 10 percent ((110-100)/100).  But acting pursuant to the non-reimbursement regulation (based on the exporter's agreement to reimburse the importer for its antidumping
(footnote continued)

where, as here, the circumstances do not support a finding of reimbursement,[26] deducting the antidumping duty deposit payments from the export price would arbitrarily double-count the dumping margin.

Therefore, because Commerce's decision not to reduce export prices by the amount of antidumping deposits paid on subject entries was, as explained above, based on a reasonable interpretation of an ambiguous statutory provision, this decision is sustained.

---

liability), Commerce deducts the reimbursed deposit (10 percent of 100 = 10) from the export price (100 – 10 = 90), thereby effectively doubling the dumping margin ((110-90)/100 = 20/100 = 20 percent).  Thus, contrary to AHSTAC's argument, Commerce's application of the non-reimbursement regulation supports Commerce's reasoning that, where this regulation is not applicable, deducting antidumping duty deposit payments from the export price would result in an arbitrary double-counting of the dumping margin.

[26] As Commerce explained, the non-reimbursement regulation is inapplicable here because "the respondents are not reimbursing or paying the assessed duties on behalf of the importer – they are paying the duties as the importer." I & D Mem. cmt. 3 at 24; see also id. ("This position is consistent with [Commerce]'s uniformly-applied interpretation of 19 C.F.R. § 351.402(f)(1)(i) that a party cannot 'reimburse' itself when acting as its own importer of record.") (citing Brass Sheet and Strip from Germany, Am. Issues & Decision Mem., A-428-602, ARP 08-09 (Oct. 28, 2010) (adopted in 75 Fed. Reg. 66,347 (Dep't Commerce Oct. 28, 2010) (amended final results of antidumping duty administrative review)) cmt. 9; Circular Welded Non-Alloy Steel Pipe and Tube from Mexico, 63 Fed. Reg. 33,041, 33,044 (Dep't Commerce June 17, 1998) (final results of antidumping duty administrative review)); AHSTAC's Br. at 21 ("AHSTAC recognizes that Commerce's practice is not to apply the [non-reimbursement] regulation [when the producer/exporter acts as the importer of record] . . . .").

**CONCLUSION**

For all of the foregoing reasons, Commerce's <u>Final Results</u> are sustained except with regard to Commerce's rejection of Marine Gold's request for individual examination as a voluntary respondent. This issue is remanded for further consideration, consistent with this opinion. Commerce shall have until September 9, 2013, to complete and file its remand results. Plaintiffs shall have until September 23, 2013, to file comments. The parties shall have until October 3, 2013, to file any reply.

It is SO ORDERED.

___/s/  Donald C. Pogue___<br>Donald C. Pogue, Chief Judge

Dated: August 2, 2013
      New York, NY